**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Roanoke Division**

CLERKS OFFICE US DISTRICT COURT
AT ROANOKE, VA
FILED
July 29, 2025
LAURA A. AUSTIN, CLERK
BY: /s/ S. Wray
DEPUTY CLERK

**Chardonnay Hope,**

Plaintiff,

**vs.**

**Ferrum College,**

Defendant.

Civil Action No. 7:25CV00510

**COMPLAINT**

**(Violations of the Title VII, Including Claims of Unlawful Segregation)**

**Jury Trial Requested**

**COMES NOW** the Plaintiff, Chardonnay Hope, by and through her attorneys, and for her causes of action, hereby states the following:

## INTRODUCTION AND SUMMARY OF CLAIMS

1. Plaintiff Chardonnay Hope ("Coach Hope" or "Plaintiff") brings this action against Ferrum College ("Ferrum" or "Defendant") for sex discrimination and race discrimination resulting in a hostile work environment, constructive discharge, and long-term damage to her coaching career, in violation of her rights under federal law. Coach Hope also alleges retaliation through Ferrum's failure to intervene despite clear notice that gender stereotyping, race stereotyping, and sex-based double standards were influencing the scrutiny, isolation, and undermining she experienced during her tenure.

2. This action is brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

3. This case arises from Ferrum College's discriminatory treatment and eventual termination of Coach Chardonnay Hope, a qualified and committed head coach, based on vague and unsubstantiated complaints that reflected longstanding gender- and race-based stereotypes

about communication, leadership, and demeanor. Rather than evaluate Coach Hope's performance according to objective coaching standards, Ferrum relied on characterizations shaped by subjective discomfort and socialized expectations. The College failed to meaningfully assess the legitimacy of the complaints or apply consistent, evidence-based standards, instead penalizing Coach Hope for her perceived failure to conform to identity-based behavioral norms.

4. Ferrum's actions lacked the procedural and evidentiary rigor expected of a fair and neutral employment process. It accepted generalized and conclusory allegations without specific factual support, failed to apply a consistent investigative framework, and reached an adverse employment decision in the absence of documented policy violations. These failures suggest not only a lapse in institutional process, but a broader reliance on stereotype-driven reasoning to justify adverse action. Coach Hope was ultimately removed not for misconduct, but for deviating from an unwritten, and unevenly enforced, code of conduct shaped by race and gender bias.

5. Courts recognize that discrimination may be proven through a "convincing mosaic" of circumstantial evidence—including inconsistently applied standards, vague rationales, and systemic disparities in treatment. That mosaic is clear here. Ferrum did not apply its standards equally to male coaches, failed to corroborate the complaints, and removed Coach Hope in reliance on gendered and racialized expectations that women—especially Black women—should be nurturing, deferential, and emotionally subdued. When Coach Hope did not conform to those stereotypes, she was labeled "abrasive," "unprofessional," or "too aggressive"—coded language frequently weaponized against women in authority. This lawsuit seeks to hold Ferrum accountable for its role in perpetuating that bias and depriving Coach Hope of her career.

6. This lawsuit challenges not only the individual acts of discrimination against Coach Hope, but the institutional structures that enabled and concealed them. Ferrum College permitted vague, stereotype-laden complaints to dictate its employment decisions, failed to conduct a fact-based investigation, and imposed standards of demeanor and communication that reflected gendered and racialized expectations. These practices harmed not only Coach Hope, but every woman—and particularly every Black woman—expected to simultaneously embody warmth, patience, and emotional containment, while being punished for traits celebrated in male coaches: directness, intensity, and unapologetic leadership.

7. In addition to her core claims of sex discrimination—and her intersectional claim based on the combined effects of race and gender—Plaintiff asserts an independent claim of unlawful segregation under Title VII. This claim challenges the systemic exclusion of women from coaching roles, particularly in men's athletics, and the structural limitations imposed on women even within women's programs.

8. Today, in the specific context of collegiate athletics, women remain subject to the last widely tolerated form of occupational segregation in American public life. Female coaches are categorically excluded from leadership roles in men's sports, and even within women's programs, they are underrepresented, holding fewer than 45% of coaching positions. This dual limitation constitutes de facto segregation. It lacks any business justification and is no less impermissible than a system in which Black coaches were excluded from coaching white athletes and restricted to fewer than half of the positions in Black programs. Segregation based on sex is no more acceptable than segregation based on race, and both are prohibited by law.

9. Plaintiff alleges that Defendant Ferrum College has engaged—and continues to engage—in unlawful occupational segregation in violation of Title VII, which prohibits

employers from limiting, segregating, or classifying employees in a manner that adversely affects their employment status on the basis of sex. Like the overwhelming majority of higher education institutions, Ferrum College employs few, if any, women in coaching roles on men's teams, whether as head or assistant coaches. Yet the College embraces and promotes the presence of men in leadership roles over women's teams.

10. Plaintiff brings this claim of unlawful segregation, classification, and limitation as an independent basis for damages and injunctive relief under Title VII. In addition to constituting a per se violation, Ferrum's segregationist practices also serve as proof of its broader pattern and practice of gender discrimination and its maintenance of policies that produce a disparate impact on women. These include, among other things, the College's failure to recruit or consider women for coaching men's teams and its restriction of women's participation even within female athletics programs.

11. Employment systems that segregate, limit, or classify employees based on protected characteristics inevitably rely upon and perpetuate negative stereotypes about the excluded group. Segregation is not neutral—it is a direct reflection of institutional assumptions about fitness, leadership, and authority. Plaintiff alleges that the exclusion of women from coaching men, and their limitation within women's programs, is direct evidence of discriminatory motive under Title VII and further supports her allegation that her gender was a motivating factor in the adverse actions taken against her. Whether viewed as circumstantial or direct evidence, Defendant's reliance on gendered assumptions in employment decision-making is unlawful under Title VII and reflects an entrenched pattern of institutionalized bias.

12. In any segregated system, the operation of harmful stereotypes is not a remote risk—it is a foreseeable and inevitable consequence. Those who maintain or tolerate segregation

almost invariably absorb and act upon the stereotypes that justify it. In such systems, the risk of stereotype-driven harm creates a duty of care to recognize and prevent that harm. Gender segregation in collegiate athletics is well documented to generate predictable harms for women in coaching. That known risk imposes a corresponding duty on institutions like Ferrum College to take reasonable measures—through training, protocols, and fair procedures—to protect against foreseeable injury. Where the risk is as pronounced as it is here, Ferrum's failure to adopt such measures constitutes negligence, and under the circumstances, may also support a theory of negligence per se. While not every context supports tort liability for institutional bias, the intensity and structural nature of gender segregation in college sports satisfies the standard.

13. Plaintiff uses the term "segregation" intentionally, to describe with precision the deeply embedded and self-perpetuating system that continues to harm women in collegiate athletics. This system imposes asymmetrical burdens on female coaches, reinforces negative stereotypes, and distorts perceptions of leadership, competence, and authority. These stereotypes are internalized not only by those who benefit from segregation—typically male coaches and decision-makers—but also by those excluded, including female athletes and coaches. In the short term, this dynamic results in coaches like Chardonnay Hope being penalized for conduct that mirrors or lags no more than that of male peers. In the long term, the system replicates itself—normalizing exclusion, reinforcing gender hierarchy, and entrenching discrimination under the guise of tradition or neutrality.

14. The scrutiny Coach Hope faced was not an isolated or subjective perception. It is consistent with decades of empirical research on the intersection of gender, race, and coaching evaluation. Studies show that female coaches are disproportionately penalized for directive or assertive communication styles, particularly when they coach women's teams. Female athletes

are socialized to view nurturing as the norm from women and toughness as expected from men. When a woman, and especially a Black woman, displays the same coaching methods as her male peers, those behaviors are reinterpreted as abrasive, aggressive, or "unprofessional." These interpretations are not driven by objective conduct, but by the identity of the person exhibiting it.

15. This dynamic creates a self-reinforcing structure of exclusion. Male coaches, shielded from these expectations, are less likely to be complained about for assertive behavior. As a result, when female coaches face consequences for such complaints, they are often unable to identify a male comparator with an identical complaint history, not because discrimination is absent, but because it operates upstream by filtering who gets scrutinized in the first place. Requiring strict comparator evidence in this context rewards bias and punishes the women subject to it. The absence of a male coach who was accused of being "too intense" is not evidence of fair treatment, but a reflection of how gendered assumptions silence those critiques when applied to men.

16. Ferrum's failure to account for this deeply documented dynamic is not merely unfortunate, it is unlawful. Coach Hope was placed in a no-win scenario: lead with conviction and be deemed abrasive or lead with deference and be deemed ineffective. Ferrum codified that impossible standard into official action when it terminated her based on amorphous complaints, without identifying a policy violation, procedural deficiency, or factual misconduct.

17. The allegations against Coach Hope were never tested by any meaningful investigatory process. Ferrum failed to document specific dates, statements, or incidents; withheld the substance of the complaints from her; and declined to ask even the most basic corroborative questions during interviews. Her termination was predetermined. At no point did

Ferrum articulate how Coach Hope's conduct violated any coaching policy or institutional rule. She was not given a genuine opportunity to respond. Instead, the College accepted emotionally framed and stereotype-driven characterizations as fact, then used them as a basis for ending the career of the first Black woman coach in its history.

18. This case is about more than the termination of a single coach. It challenges a broader system in which female coaches (especially women of color) are evaluated through a distorted lens that frames leadership as inherently masculine and penalizes those who do not conform to gendered and racialized expectations. The law forbids such discrimination not only in hiring and firing, but also in the subtle, often unspoken ways that institutional culture, socialization, and bias shape how authority is perceived and judged. Coach Hope brings this action not only to remedy the harm she has suffered, but to confront the structures that continue to deny women in coaching the opportunity to lead on equal terms.

## JURISDICTION AND VENUE

19. This action is brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and, where applicable, Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, to remedy unlawful sex discrimination, including discrimination based on gender stereotyping, retaliation, and sex-based occupational segregation.

20. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), as this case involves federal questions arising under Title VII and Title IX. The Court has supplemental jurisdiction over related state law claims pursuant to 28 U.S.C. § 1367.

21. Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred within this district and because Defendant Ferrum College resides and conducts business within this district.

## PROCEDURAL HISTORY

22. Plaintiff Chardonnay Hope timely filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission (EEOC), Charge No. 438-2024-01745, on June 3, 2024, alleging race discrimination, sex discrimination, and retaliation in violation of Title VII.

23. On May 2, 2025, the EEOC issued a Notice of Right to Sue. This action is filed within 90 days of Plaintiff's receipt of that notice, and all administrative prerequisites to the filing of this action have been satisfied.

24. Plaintiff also submitted internal complaints to Ferrum College regarding discrimination and unequal treatment, placing the institution on notice of the unlawful conduct described in this Complaint.

## FACTUAL BACKGROUND

25. Coach Chardonnay Hope was hired by Ferrum College on April 18, 2022, as the Head Coach for the women's field hockey program.

26. At the time of her hiring, Coach Hope became the first Black woman to coach at Ferrum College, taking on a program with only 11 players and no prior clinic history.

27. Despite these challenges, Coach Hope recruited 12 student-athletes in her first recruiting class and organized the first-ever field hockey clinic at Ferrum, significantly expanding the team and program visibility.

28. Her efforts to build a sustainable and competitive field hockey program included recruiting, team-building, athlete development, and campus engagement; all consistent with her contractual and professional obligations as a collegiate head coach.

29. Coach Hope's employment was governed by a one-year athletics agreement covering July 1, 2023, through June 30, 2024, with an annualized salary of $46,000.

30. In fall 2022, Coach Hope was investigated regarding text messages she sent to her team that referenced other Ferrum staff members.

31. After the investigation concluded, Coach Hope was provided a contract for the 2023/24 school year.

32. Coach Hope continued in her role without incident for nearly a year. During this time, she maintained full compliance with her coaching responsibilities, expanded recruiting outreach, and contributed to the athletic department's growth.

33. On September 13, 2023, vague complaints were made against Coach Hope by two student-athletes on the women's field hockey team. These complaints included generalized allegations of "unprofessionalism" and "hostile" behavior but lacked specific, factual descriptions of any policy-violating conduct.

34. On September 18, 2023, Ferrum College placed Coach Hope on paid administrative leave and issued a notice of allegations. The notice consisted only of conclusory labels such as "degrading," "excessive cursing," and "inappropriate comments," without citing a single specific statement, date, or policy violation.

35. Despite knowing that the allegations lacked substantiating evidence, the College moved forward with an internal investigation, during which it failed to identify even one witness statement, document, or corroborated account to support the complaints lodged against Coach Hope.

36. Between September 19 and 29, 2023, Ferrum College interviewed 16 members of the women's field hockey team, along with Coach Hope and her assistant coaches. Yet the questions posed during these interviews failed to probe the basis of the allegations or explore potential gendered misperceptions of Coach Hope's coaching style.

37. The College did not ask athletes foundational questions that would be expected in any legitimate investigative process, such as when, where, or in what context Coach Hope allegedly used the terms "pathetic" or "loser," or what language was actually considered "degrading" or "excessive."

38. No statements were collected that documented a single specific instance of Coach Hope using abusive or demeaning language. No records (texts, emails, or notes) were produced to show even one incident of inappropriate conduct. The entire investigation rested on subjective impressions and vague descriptors, without factual grounding.

39. Throughout the investigation, Coach Hope maintained that her coaching methods were consistent with Ferrum's expectations and aligned with standard practices in collegiate athletics. Her emphasis on accountability, performance, and direct communication mirrored techniques used by male coaches throughout the department, coaches who were not subject to scrutiny for similar conduct.

40. Despite the absence of evidence and her clear record of compliance and improvement, Coach Hope was terminated.

41. Coach Hope's termination cannot be understood apart from the broader pattern of sex-based segregation and stereotyping that pervades collegiate coaching. Across the country, women remain underrepresented in head coaching roles, even in women's sports. This underrepresentation is not due to a lack of interest or ability, but rather to structural and social barriers rooted in persistent stereotypes about gender and leadership. Female coaches are subject to heightened scrutiny, are more likely to be labeled as "too intense" or "not approachable," and are often evaluated based on perceived personality traits rather than performance outcomes. See

Rachel Madsen, "Dads Play Basketball, Moms Go Shopping!" Social Role Theory and the Preference for Male Coaches, 10 Journal of Contemporary Athletics 277, 283 (2016).

42. These stereotypes operate through both descriptive and prescriptive channels. Descriptive stereotypes assume that women are naturally more nurturing, less assertive, and less authoritative than men. Prescriptive stereotypes punish women for violating those assumptions—labeling them aggressive, cold, or unlikable when they exhibit traits that are viewed as acceptable or even expected in male leaders. See, e.g., Lindsay Darvin et al., Are Men Better Leaders? An Investigation of Head Coaches' Gender and Individual Players' Performance in Amateur and Professional Women's Basketball, 78 Sex Roles 455, 457–58 (2017).

43. These gendered perceptions are not innate. They are the product of gender socialization, a process by which individuals learn, from an early age, the roles, behaviors, and expectations associated with their assigned gender. For women, this socialization emphasizes warmth, approachability, and emotional sensitivity. For men, it emphasizes assertiveness, independence, and control. As a result, female authority figures who act in accordance with traditionally male-coded traits (such as decisiveness or directness) are often perceived as violating social norms, even when their behavior is identical to that of a male colleague. These perceptions are not conscious choices, but learned biases embedded through years of cultural reinforcement.

44. In the athletic context, these effects are particularly pronounced. Female athletes, like their male peers, are immersed in sporting environments that overwhelmingly associate coaching and leadership with masculinity. The vast majority of their early athletic experiences are shaped by male coaches. When a woman steps into that same role and employs the same coaching style, it can trigger dissonance between expectation and reality. That dissonance often

manifests as discomfort, not because the coach's behavior is objectively harmful, but because it challenges internalized assumptions about who a coach is supposed to be. Institutions that fail to recognize this dynamic (and that respond to student discomfort without interrogating its source) risk acting as vehicles for discrimination.

45. This dynamic played out in full during Coach Hope's tenure. In the weeks leading up to her termination, vague and subjective complaints were raised about her leadership style—none of which cited any policy violation, misconduct, or specific incident. Rather than identifying actionable behavior, these concerns relied on generalized language such as "inappropriate comments" or "excessive cursing," without ever specifying what was said, when it was said, or to whom. The underlying issue was not Coach Hope's conduct, but how her assertive and direct coaching style conflicted with gendered expectations about how a female coach should communicate. Her efforts to hold athletes accountable were mischaracterized as unprofessional or emotionally harmful, despite the fact that male coaches at Ferrum College used similar methods without criticism or consequence.

46. Title VII prohibits employers from making decisions based on sex-based stereotypes or from applying different evaluative standards to men and women.

47. Yet the very feedback used to justify Ferrum's adverse action against Coach Hope (vague and generalized claims such as "inappropriate comments," "excessive cursing," and "degrading language") mirrors the types of conclusory allegations that have been empirically linked to gender bias in the evaluation of female coaches. At no point did Ferrum identify a specific incident, date, quote, or policy violation to support its decision, nor did it provide any documentary or testimonial evidence to substantiate the alleged misconduct.

48. By accepting unsubstantiated and subjective perceptions without investigation, documentation, or corroboration, Ferrum not only failed to mitigate the risk of gender bias, it allowed such bias to dictate its employment decision. Rather than probing the basis of the allegations or applying a consistent evaluative framework, Ferrum credited vague complaints and reached a predetermined conclusion shaped by gendered assumptions rather than objective review.

49. At the time she was hired on April 18, 2022, Coach Hope inherited a struggling field hockey program with only 11 athletes on the roster. She stepped into the role with the expectation of building a competitive and sustainable team from the ground up. Over the course of her tenure, she recruited 12 additional student-athletes, launched Ferrum's first-ever field hockey clinic, and implemented coaching strategies focused on accountability, discipline, and long-term development. Like many head coaches, Coach Hope held her athletes to high standards. She did this not to punish, but to cultivate resilience and a competitive mindset essential to collegiate athletics.

50. These are standard responsibilities for any head coach seeking to build a program and foster excellence. Yet for Coach Hope, fulfilling those duties exposed her to gendered scrutiny that male coaches routinely avoid. By holding athletes accountable and employing a direct coaching style, she was labeled "too intense," "inappropriate," or "unprofessional," labels rarely affixed to male coaches who push athletes in pursuit of performance and growth.

51. Research confirms that women in coaching are more likely to be critiqued on vague emotional or interpersonal grounds, especially when they hold players accountable or assert authority. See generally R. Vivian Acosta and Linda J. Carpenter, Women in Intercollegiate

Sport, AcostaCarpenter, (2014) (available at http://www.acostacarpenter.org/2014%20Status%20of%20Women%20in%20Intercollegiate%20Sport%20-37%20Year%20Update%20-%201977-2014%20.pdf) (last accessed July 1, 2025).

52. Coach Hope's final day of employment was October 9, 2023. In terminating her employment, Ferrum College cited no violations of institutional policy and offered no performance-based justification for its decision. She was given no opportunity to formally respond to the allegations, nor was any substantiating evidence ever shared.

53. This lack of transparency violated basic procedural expectations and reflected Ferrum's willingness to accept gendered and racialized perceptions at face value. The administration's reliance on vague discomfort and without inquiry, documentation, or corroboration, demonstrates how subjective reactions rooted in stereotype can be elevated to the level of institutional judgment when the subject is a woman in authority.

54. Meanwhile, male coaches at Ferrum College were afforded clearer expectations, more lenient interpretations of student concerns, and broader opportunities to adjust their coaching style without consequence. Complaints against male coaches were either dismissed as part of the coaching process or treated as discrete, coachable events. In contrast, complaints about Coach Hope were treated as inherently credible and indicative of her unfitness for the role. This differential treatment is not merely inequitable; it is unlawful under Title VII, which prohibits the disparate application of discipline and adverse employment actions on the basis of sex.

55. The decision to remove Coach Hope from her position on October 9, 2023, was not based on poor performance, misconduct, or any identifiable institutional need. It was the culmination of a pattern in which gender shaped how her leadership was perceived, how complaints against her were interpreted, and how decision-makers evaluated her ongoing role.

Despite her proven recruiting success, documented team development, and full compliance with directives, she was terminated without cause, investigation, or any explanation grounded in objective performance criteria. Given Ferrum's failure to treat similarly situated male coaches with comparable scrutiny or consequences, the only reasonable conclusion is that Coach Hope was penalized not for how she coached, but for the fact that she did so as a woman.

56. The circumstances surrounding Coach Hope's dismissal are not unique. Female coaches across the country are being held to conflicting expectations and punished for behaviors considered normal or even commendable in men.

57. At Ferrum, these patterns are reflected in the broader structure of the athletic department. Men hold a disproportionate number of head coaching roles, including in women's sports, and female coaches are consistently underrepresented in decision-making positions.

58. Ferrum does not employ a single woman in an assistant coaching role of any men's team.

59. Of the eight head coaches of male teams, none are female.

60. Of the 25 assistant coaching positions for men's teams, zero are occupied by women, while men hold 100 percent of these roles.

61. On the other hand, men are permitted to coach women's teams, both as head and as assistant coaches.

62. That disparity is not the product of coincidence or qualification. Rather, it is the predictable result of an environment that treats male leadership as the default and female leadership as provisional.

63. The College's reliance on unsubstantiated, gendered complaints was especially egregious given its failure to account for how gender stereotypes distort perceptions of coaching

behavior. While it may appear difficult to identify direct comparators in cases involving sex-based stereotyping, that difficulty is itself a product of the bias at issue. Female coaches are more likely to be complained about for the same behaviors that go unnoticed or are accepted when exhibited by male coaches.

64. Likewise, male athletes, parents, and administrators are less likely to perceive male coaches' conduct as problematic, and male coaches working with male athletes are often shielded from the kinds of emotional and interpersonal scrutiny directed at women. The fact that fewer complaints may be filed against male coaches does not indicate that they behave differently. It reflects how gender shapes the likelihood, content, and credibility of those complaints.

65. When a female coach is penalized based on vague or subjective feedback, while male coaches engaging in similar behavior are not subject to equivalent scrutiny or consequence, the disparity cannot be reconciled with neutral enforcement of institutional standards.

66. Every male coach at Ferrum College represents a valid comparator to Coach Chardonnay Hope, as they either: (i) coach similarly without complaints or termination; (ii) employ assertive or authoritarian coaching styles without consequence; or (iii) receive administrative support and benefit of the doubt when complaints arise.

67. Male coaches at Ferrum are permitted to use a full range of coaching methods—including those traditionally characterized as "masculine," such as directness, intensity, and strict discipline—without being labeled as "toxic," "abusive," or "unprofessional." These behaviors are instead framed as "strong leadership" or "high standards."

a. Ryan Brittle (Baseball) maintained his position from 2013 to 2023 despite employing a firm, performance-driven coaching style. His disciplinary

actions, including benching and direct confrontation, are viewed as "accountability" rather than misconduct.

b. Patrick Corrigan (Men's Basketball) (resigned 2024) is known for his intense sideline demeanor and demanding expectations. His communication style, which mirrors or exceeds the directness attributed to Coach Hope, is interpreted as "competitive spirit" rather than inappropriate behavior.

c. Cleive Adams (Football, 2020–2023), who was later promoted to Athletic Director, regularly used high-pressure tactics and vocal criticism during games and practices. Despite the intensity of his methods, he was rewarded with advancement rather than reprimand.

d. Mark White (Cross Country and Track & Field) (resigned 2024) coached both men's and women's teams using consistent, rigorous training and direct feedback. His raised voice and demanding standards are seen as motivational, not problematic, even when applied to female athletes.

e. Rod Baker's (Men's and Women's Tennis) (2014-2024) assertive coaching style was accepted without scrutiny, despite employing similar methods to those for which Coach Hope was disciplined.

f. Bryan Harvey (Women's Basketball and Interim Men's Golf) has coached women's teams since 2005. His longevity and administrative support, even when complaints have arisen, contrast sharply with the treatment of Coach Hope.

g. Josh Freeman (Women's Softball) and Zach Louie (Men's Lacrosse, 2022–2023) both utilized direct, performance-based coaching methods. Their

approaches, while occasionally drawing athlete complaints, were met with institutional backing rather than punitive action.

68. The key issue is not that these male coaches engage in misconduct, but that standard coaching practices—such as setting clear expectations, using direct communication, and enforcing discipline—are interpreted differently when employed by female coaches.

69. Male coaches of women's teams, in particular, receive greater latitude than their female counterparts:

a. Mark White (Women's Cross Country and Track & Field) applies the same demanding methods to both male and female athletes, yet only female coaches like Coach Hope are penalized when female athletes express discomfort.

b. Rod Baker and Bryan Harvey, both long-tenured male coaches of women's teams, have faced athlete concerns over the years, yet continue to receive institutional support and are not subjected to the same level of scrutiny or disciplinary action as Coach Hope.

70. This disparate treatment constitutes direct evidence of gender discrimination. While male coaches are presumed competent and supported through complaints, Coach Hope was presumed guilty, suspended, and terminated without the same opportunity to respond or receive institutional backing.

71. As a result of Ferrum College's gender-based stereotyping, discriminatory practices, and failure to apply consistent standards, Plaintiff has suffered significant harm, including emotional distress, reputational damage, and loss of professional opportunities. Her

termination has created a lasting stigma that continues to hinder her career advancement and requires equitable relief to address.

72. The College's disregard for the discriminatory implications of its conduct reflects a broader institutional failure to recognize how structural bias operates. By treating perceptions as reality, particularly perceptions shaped by gendered expectations, it allowed discriminatory attitudes to dictate personnel decisions. Title VII prohibits employers from acting on the basis of such stereotypes, even when they are sincerely held by others. The law does not permit an employer to insulate itself from liability by outsourcing bias to employees or cloaking it in subjective justifications.

83. The message sent by Ferrum College through its treatment of Coach Hope is unmistakable: that women in coaching must navigate a narrower and less forgiving path, where even full compliance with expectations offers no protection if those expectations are filtered through a gendered lens. That message is not only damaging to Coach Hope—it undermines the very principles of equal opportunity and fairness enshrined in Virginia civil rights law. It signals to other female coaches that their authority is conditional, their leadership inherently suspect, and their positions more vulnerable than those of their male peers.

84. These gender discrimination issues at Ferrum College are not isolated to athletics.

85. Similar patterns of biased treatment are evident in the case of President Dr. Mirta Martin, who was subjected to strikingly parallel gender-based criticisms despite objectively successful leadership.

86. Ferrum College's institutional culture subjects all female leaders to heightened scrutiny, disparate treatment, and subjective evaluation standards not applied to male counterparts.

87. In May 2025, 87% of faculty present voted no confidence in President Martin, accusing her of fostering a "toxic work environment" and lacking transparency. Criticisms included vague complaints about her leadership style and demeanor (e.g., discouraging feedback and referring to colleagues as "dumb-dumbs") that mirror the generalized accusations leveled against Coach Hope, such as being "unprofessional" and creating a "hostile environment," without concrete factual support.

88. The Board of Trustees unanimously rejected the faculty's criticisms and issued a formal vote of confidence in President Martin, citing specific, measurable achievements: record enrollment, exceeding fundraising goals, restructuring academics, transitioning to NCAA Division II, improving finances by 57%, and increasing alumni engagement.

89. This contrast—objective success versus subjective complaints—demonstrates that when Ferrum applies neutral standards, female leaders like Dr. Martin are shown to be effective. The failure to apply such standards consistently across the institution reveals a systemic bias.

90. The treatment of both Coach Hope and President Martin aligns with well-documented research on gender bias in leadership. Studies show that women leaders are penalized when they exhibit agentic traits (assertiveness, decisiveness) typically valued in leadership, because these traits conflict with stereotypically "feminine" expectations.

91. Role congruity theory explains that agentic leadership is viewed as incompatible with female gender norms, resulting in negative evaluations. This leads to women being judged more critically than men, even when performance is equal. Biased teaching evaluations and performance reviews further confirm this pattern.

92. Like President Martin, Coach Hope was criticized using vague, emotionally-charged language divorced from performance metrics. Yet Hope had concrete successes: she recruited 12 new athletes to a struggling program, launched the College's first field hockey clinic, and significantly raised program visibility.

93. Despite these results, the College relied on unsupported allegations of "unprofessionalism" and "hostility." The investigation uncovered no statements or records substantiating misconduct—no texts, emails, or specific incidents.

94. That both faculty and athletics officials relied on stereotyped criticisms—devoid of factual support—demonstrates a systemic issue. Faculty, who should be trained to recognize bias, engaged in the same behavior as the athletic department, confirming the College's broader culture of stereotyping female leaders.

95. This culture, not isolated actors, is responsible for the disparate treatment Coach Hope experienced. Her termination was the predictable outcome of an institution that applies harsher, more subjective standards to women in leadership.

96. Coach Hope brings this action not only to redress the harm she has suffered, but to confront the institutional structures and attitudes that allowed it to occur. Her case does not seek to silence student voices or diminish athlete expression; rather, it calls for those voices to be considered responsibly, with an understanding of how bias can distort perception. It demands that educational institutions be held accountable when they permit prejudice, however subtle or well-intentioned, to influence employment decisions. Through this litigation, Coach Hope seeks acknowledgment, accountability, and the enforcement of a fundamental workplace principle: that no one should be removed from their role simply because they do not conform to a stereotype.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of Virginia Human Rights Act, § 2.2-3900 *et seq.*
### (Sex Discrimination, Race Discrimination, and Hostile Work Environment)

73. Given the overlap of effects of segregation, stereotypes and the impact on the work environment and evaluation of Plaintiff, Plaintiff re-alleges and incorporates by reference preceding paragraphs ¶¶ 27-96 as if fully set forth herein.

74. Plaintiff has satisfied all administrative prerequisites to suit under Title VII, including timely filing of a charge with the EEOC and receipt of a Notice of Right to Sue.

75. Title VII prohibits an employer from discriminating against an employee on the basis of sex or race. 42 U.S.C. § 2000e-2(a).

76. At all relevant times, Defendant Ferrum College was an "employer" within the meaning of Title VII and was subject to its requirements.

77. Coach Hope is a member of a protected class based on her sex.

78. Defendant discriminated against Coach Hope on the basis of sex and race by treating her less favorably than similarly situated male coaches, subjecting her to heightened scrutiny, applying disparate evaluative standards, and ultimately terminating her employment based on gender stereotypes and perception bias.

79. The adverse actions taken against Coach Hope were driven by sex-based and race-based assumptions about how female coaches should lead. She was held to a standard shaped by gendered expectations of warmth, deference, and emotional attunement, while male coaches employing comparable leadership styles were neither scrutinized nor penalized. Defendant's reliance on uncorroborated perceptions and generalized student discomfort reflects the operation of prescriptive and descriptive bias in violation of Title VII.

80. Defendant failed to conduct a meaningful investigation into the concerns raised against Coach Hope. It accepted complaints without verification, withheld details of the allegations, and treated the existence of discomfort as a proxy for wrongdoing. This process lacked transparency, consistency, and objectivity, and permitted gender-based assumptions to substitute for fact-based analysis.

81. Female coaches at Ferrum College, including Coach Hope, were required to navigate a system in which they bore additional burdens not imposed on male colleagues. These included managing athlete perceptions more carefully, adapting their communication styles to avoid gendered critique, and contending with higher rates of reporting based on gender socialization. These expectations constitute a form of systemic sex-based segregation in violation of Title VII.

82. Defendant further misinterpreted increased reporting by female athletes (a predictable outcome of gender socialization) as evidence of coaching failure. This response, known in the literature as the "protection paradox," led to protective institutional action on behalf of athletes without regard to the validity or consistency of the underlying claims. At the same time, the content of those complaints was not subjected to meaningful scrutiny, creating a discriminatory feedback loop that uniquely disadvantaged Coach Hope.

83. On information and belief, Defendant acted with reckless disregard for Coach Hope's rights under Title VII.

84. The systematic gender bias demonstrated throughout Ferrum College's institutional culture provides direct evidence of discriminatory intent and motive in Coach Hope's termination. The parallel treatment of President Dr. Mirta Martin, who faced identical stereotype-driven criticism from faculty members, demonstrates that gender-based evaluation

standards are systematically applied to female leaders at Ferrum College.

85. Faculty voted no confidence in President Martin using the same vague, subjective language applied to Coach Hope—accusations of fostering a "toxic work environment" and lacking transparency—despite President Martin's objective achievements including the largest freshman class in three years and improving the college's financial position by 57%. The Board of Trustees' rejection of these faculty criticisms as unfounded demonstrates that when gender bias is removed from evaluation processes, female leaders at Ferrum College perform effectively.

86. The fact that educated faculty members applied the same stereotypical criticisms to President Martin that were applied to Coach Hope provides powerful evidence that gender stereotyping is deeply embedded throughout Ferrum College's institutional culture, confirming that Coach Hope's treatment was not an isolated incident but part of a systematic pattern of discrimination against female leaders.

**SECOND CAUSE OF ACTION**
**Violation of Title VII**
**(Illegal Segregation and Limitation on Hiring and Retention of Women)**

87. Plaintiff re-alleges and incorporates by reference preceding paragraphs ¶¶ 27-96 as if fully set forth herein.

88. Title VII prohibits not only overt discrimination but also employment practices that result in the classification, segregation, or limitation of individuals on the basis of sex in a way that deprives them of employment opportunities or adversely affects their status. 42 U.S.C. § 2000e-2(a)(2).

89. Defendant has engaged in unlawful occupational segregation by systematically excluding women from head coaching positions in men's sports while hiring and retaining men in head coaching roles in women's sports. This practice creates and reinforces sex-based

limitations on employment opportunities and perpetuates a gendered hierarchy within the athletic department.

90. As of the time of filing, Ferrum College has employed no women to coach men's teams, yet continues to hire and support men to coach women's teams. This pattern reflects a discriminatory institutional structure that restricts women's advancement and perpetuates the stereotype that men are more qualified to lead, regardless of the gender of the athletes.

91. Coach Hope was harmed by working within this segregated structure. The existence of sex-based job channeling perpetuated stereotypes that required her, and other female coaches, to shoulder additional interpersonal labor and operate within a narrower band of acceptable behavior. These constraints were not imposed on her male colleagues.

92. Coach Hope has not applied for a position coaching a men's team. However, that fact is itself the result of the College's de facto segregation, which discourages female candidates from pursuing such roles and signals institutional disinterest in challenging traditional gender lines.

93. Even if Coach Hope is not eligible for direct damages related to exclusion from coaching men's teams, Ferrum College's pattern of sex-based segregation contributes to a broader discriminatory culture. It reinforces gender stereotypes among athletes, staff, and administrators, and creates an environment in which female coaches are treated as less authoritative and more expendable.

94. Ferrum College's continued use of a segregated staffing model in its athletic programs is evidence of systemic discrimination, and supports the claims of unequal treatment raised in Count I. It also reflects institutional knowledge of the risks that gender stereotyping poses, and the need for heightened diligence in responding to complaints against female coaches.

95. Ferrum College's institutional knowledge of gender bias risks is further demonstrated by the Board of Trustees' ability to recognize and reject unfounded gender-based criticism when applied to President Martin, while simultaneously failing to protect Coach Hope from the same biases. This differential response demonstrates that the institution possessed the knowledge and capability to identify and prevent gender stereotyping but negligently failed to apply these safeguards to Coach Hope's situation.

96. The systematic nature of gender bias throughout the institution, as evidenced by faculty criticism of President Martin, placed Ferrum College on notice of the pervasive risks of stereotype-driven evaluation and created a heightened duty of care to protect female employees like Coach Hope from foreseeable discriminatory harm.

97. Defendant's actions constitute a per se violation of Title VII's prohibition on sex-based classification and occupational limitation.

98. Defendant acted with deliberate indifference to Coach Hope's rights under federal law, and with willful disregard for the foreseeable harm caused by its policies and practices.

**THIRD CAUSE OF ACTION**
**Violation of Title VII**
**(Negligent Discrimination)**

99. Plaintiff re-alleges and incorporates by reference preceding paragraphs ¶¶ 27-96 as if fully set forth herein.

100. Title VII imposes an affirmative duty on employers to maintain a workplace free from sex-based discrimination, including obligations to prevent foreseeable harms arising from gender stereotyping and sex-based disparate treatment.

101. Defendant had actual and constructive knowledge of the risks associated with gender bias in collegiate athletics. Its own training materials, policies, and organizational

practices reflect an awareness of stereotype-based harms and the structural challenges faced by female coaches.

102. Defendant had specific knowledge of the risks faced by Coach Hope, including repeated references to gender stereotypes in student commentary, evidence of differential treatment based on gendered expectations, and its own awareness of the limited representation of women in leadership roles.

103. Defendant also participates in sex-based occupational segregation by failing to recruit, hire, or retain women to coach men's teams, while placing male coaches in leadership roles over women's teams. This structural inequality exacerbated the risks of stereotype-driven complaints and discipline.

104. Defendant owed Coach Hope a duty of care to implement nondiscriminatory investigative and disciplinary procedures. This duty is particularly critical in the context of college athletics, where gender stereotypes are well-documented and carry predictable impacts on evaluation and discipline.

105. Defendant breached that duty by conducting an investigatory process that appeared procedurally formal but was substantively deficient and biased. Despite purporting to investigate the matter, the College:

i. Failed to reach conclusions on the truth or falsity of specific allegations;

ii. Treated unverified complaints as substantiated without corroboration or testing for accuracy;

iii. Avoided examining the influence of gender bias, stereotype activation, or gendered perception discrepancies;

iv. Withheld the full investigatory report from Coach Hope and her counsel; and

v. Conflated emotional responses, hearsay, and stereotype-driven expectations with objective evidence.

97. Defendant's negligence is further demonstrated by its failure to adopt standard investigative safeguards that would have reduced the impact of bias, including:

i. Requiring specificity regarding alleged conduct (dates, times, witnesses, statements);

ii. Verifying allegations against available data sources such as practice schedules and third-party observers;

iii. Comparing athlete perceptions of male and female coaches engaging in similar conduct;

iv. Applying forensic techniques to distinguish credible recall from confabulation; and

v. Assessing the possibility of narrative contamination within athlete group dynamics.

98. Defendant also failed to control for the "protection paradox," whereby gendered help-seeking behaviors by female athletes interact with institutional protective reflexes to yield unequal treatment of female coaches. Despite its own knowledge of gender-based reporting disparities, Defendant applied no safeguards to prevent this dynamic from distorting outcomes.

99. Defendant negligently failed to collect or analyze data that would have revealed the disparate impact of its disciplinary systems on women. This includes the failure to track

differences in complaint frequency or intensity by athlete gender, or to assess whether comparable behavior by male coaches resulted in lesser consequences.

100. These failures were not isolated lapses but reflected a systemic disregard for procedures that would have exposed gender bias. Defendant's pattern of procedural avoidance and overreliance on subjective, unverified complaints amounts to gross negligence and deliberate indifference to Coach Hope's rights under Title VII.

101. The College's long-standing practice of gender-based coaching segregation further evidences its institutional awareness of the risks posed by stereotype-driven evaluations and its failure to take corrective action.

**FOURTH CAUSE OF ACTION**
**Violation of Title VII**
**(Disparate Impact Discrimination)**

102. Plaintiff re-alleges and incorporates by reference preceding paragraphs ¶¶ 27-96 as if fully set forth herein.

103. Title VII prohibits not only intentional discrimination but also facially neutral employment policies and practices that have a disproportionate adverse effect on individuals based on sex, even in the absence of discriminatory intent. 42 U.S.C. § 2000e-2(k).

104. Defendant Ferrum College has implemented and maintained facially neutral policies and practices that have a disparate impact on female coaches and, in particular, female coaches of women's teams. These include:

i. <u>Complaint-Driven Evaluation Policy:</u> Ferrum College evaluates coaches and initiates disciplinary proceedings largely based on the number and nature of athlete complaints, without requiring corroboration or neutral validation. Because female athletes report concerns at significantly higher rates than male athletes (due to well-documented gender-based

socialization patterns) this policy results in female coaches being subjected to disproportionately greater scrutiny than similarly situated male coaches.

ii. <u>Flawed Investigative Procedures:</u> Ferrum's investigative framework fails to require specific factual allegations, does not ensure corroboration through neutral witnesses, does not distinguish firsthand observation from inference, and does not account for the operation of gender stereotypes. These practices increase the risk that female coaches will be adversely affected by stereotype-driven narratives more frequently than male counterparts.

iii. <u>Reactive Intervention Without Contextual Training:</u> Ferrum College takes adverse employment action in response to student complaints without first providing education to athletes, investigators, or decisionmakers on gender-based reporting differences, stereotype activation, or the "protection paradox." This lack of institutional awareness amplifies the impact of gendered complaint patterns and disadvantages female coaches subject to those biases.

105. The disparate impact of these policies is evidenced by available statistical data, including:

i. The complete exclusion of women from head coaching roles for men's teams at Ferrum College, and complete exclusion from assistant coaching positions for men's teams; and

ii. The disproportionate rate at which female coaches of women's teams face adverse employment actions relative to male coaches who employ similar or more intense coaching methods.

106. These disparities are not attributable to chance or neutral factors. Instead, they reflect the way Ferrum College's facially neutral practices interact with gender-based social dynamics—particularly differences in athlete reporting behaviors and stereotype confirmation bias—to produce consistent disadvantages for female coaches.

107. Ferrum College's policies and practices that cause this disparate impact are not job-related for the coaching roles in question and are not consistent with business necessity. Even if Defendant could demonstrate business necessity, less discriminatory alternatives are readily available and include:

i. Implementing multi-method evaluation frameworks that incorporate performance metrics, coaching history, and neutral observations rather than relying primarily on student complaints;

ii. Adopting standardized investigative procedures that require specificity, corroboration, and comparator analysis;

iii. Providing training on gender socialization and stereotype awareness to students, investigators, and administrators; and

iv. Instituting equitable evaluation protocols that adjust for known differences in gendered reporting and emotional framing.

108. Defendant has failed to adopt any of these readily available alternatives, continuing instead to enforce policies that systematically disadvantage female coaches. This

ongoing refusal to address the foreseeable disparate impact of its practices constitutes a violation of Title VII.

109. The parallel treatment of Coach Hope and President Martin provides institutional evidence that Ferrum College's facially neutral evaluation policies have a disparate impact on female leaders. Both women were subjected to the same pattern of vague, emotionally-charged criticisms focused on leadership style rather than objective performance measures, demonstrating the systematic operation of policies that disadvantage women.

110. The Board's ability to recognize President Martin's objective achievements while faculty focused on subjective criticisms demonstrates that alternative, less discriminatory evaluation methods are readily available and that Ferrum College's continued reliance on stereotype-prone assessment processes constitutes a choice to maintain policies with known disparate impact.

**FIFTH CAUSE OF ACTION**
**Violation of Title VII**
**(Pattern and Practice Discrimination)**

111. Plaintiff re-alleges and incorporates by reference preceding paragraphs ¶¶ 27-96 as if fully set forth herein.

112. Title VII prohibits employers from engaging in a pattern or practice of discrimination such that discriminatory conduct becomes the standard operating procedure, rather than an isolated occurrence. *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977).

113. Defendant Ferrum College has engaged in a pattern and practice of gender-based discrimination that extends beyond Coach Hope's individual experience and reflects systemic disparities in the hiring, evaluation, and retention of female coaches. These practices include, but are not limited to:

i. The complete exclusion of women from head coaching positions for men's teams at Ferrum College, and the total exclusion of women from assistant coaching positions for those teams;

ii. The application of fundamentally different evaluative standards to female coaches, as evidenced by the treatment of Coach Hope, who was terminated based on subjective athlete complaints that were neither verified nor contextualized, while male coaches using similar or more intense coaching methods remain employed without comparable scrutiny;

iii. Consistent use of investigative procedures that fail to account for the operation of gender stereotypes, do not require specificity or corroboration, and disregard known gender-based differences in athlete reporting behaviors; and

iv. Institutional disregard for established social science principles—including the "protection paradox" and gender socialization—which predict and explain the disproportionate scrutiny faced by female coaches of female athletes.

114. These practices are not the result of isolated misjudgments or rogue decision-makers. Rather, they reflect a systemic and recurring pattern of conduct that disadvantages women and embeds gender bias throughout Ferrum College's athletic department and broader administrative structure.

115. The consistent exclusion of women from coaching men's teams, combined with the disparate treatment of women coaching women's teams, constitutes powerful evidence that

gender-based discrimination is a routine and institutionalized feature of Ferrum College's employment practices.

116. This pattern and practice of discrimination has resulted in the maintenance of a segregated and unequal coaching environment, perpetuated stereotypes regarding women in leadership, discouraged female participation in athletic leadership roles, and exposed women—particularly those coaching female athletes—to disproportionate professional risk and reputational harm.

117. The systematic gender bias evidenced throughout Ferrum College's institutional culture, including faculty criticism of President Martin and the discriminatory treatment of Coach Hope, establishes a pattern and practice of gender-based discrimination that extends beyond individual incidents to reflect standard operating procedures.

118. The consistent application of stereotype-driven evaluation standards to female leaders across different departments and levels of the institution demonstrates that gender-based discrimination has become embedded as the standard method of evaluating female leadership at Ferrum College, satisfying the requirements for pattern and practice liability under Title VII.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Chardonnay Hope requests judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages; reinstatement; lost wages and benefits; compensatory damages for loss of employment; emotional pain and suffering; indignity; humiliation; embarrassment; inconvenience; damage to her reputation; loss of career; out-of-pocket expenses; punitive damages; equitable relief; and any other relief the Court deems just and necessary to make Plaintiff whole and effectuate the purposes of Title VII;

prejudgment and post-judgment interest as allowed by law; attorneys' fees; expert witness fees; and costs.

The actions of Defendant also require the imposition of specific equitable and injunctive relief necessary to enforce the mandates of Title VII including, but not limited to:

a. Ordering Ferrum College to reinstate Chardonnay Hope to her position as head coach of the women's softball team.

b. A mandatory injunction that requires Defendant to begin recruiting and hiring women to coach men in assistant and head coaching positions;

c. Training on the removal of implicit bias and gender stereotypes from the assessment of female students and female coaches;

d. Training on gender-based reporting differences and the protection paradox that creates inequitable evaluation systems for coaches of women's teams;

e. Implementation of multi-method assessment approaches that account for gender differences in help-seeking and reporting behaviors;

f. Implementing investigation methodology reforms that require incident specificity, factual verification, and comparative analysis for all coaching complaints;

g. A public statement that clears Chardonnay Hope from any suggestion that she engaged in any violation of policy or coaching standards.

h. Such other and further relief as needed to make Chardonnay Hope whole.

i. Declaring that Coach Hope's employment contract has been renewed for a five-year term from July 1, 2024 through June 30, 2029 pursuant to the enthusiastic recommendation and approval she received on March 23, 2023, and that FC's

later decision not to renew her contract violated both her constitutional right to due process and Virginia law.

**INJUNCTIVE RELIEF**

Plaintiff seeks a mandatory injunction to eliminate the ongoing gender segregation within Ferrum College's athletic coaching staff. Defendant maintains a system in which men are permitted to coach both men's and women's teams, while women are effectively excluded from coaching men's teams. This pattern constitutes illegal segregation in violation of Title VII, which prohibits employers from limiting, segregating, or classifying employees in a way that deprives individuals of employment opportunities based on sex. The existing structure imposes systemic burdens on female coaches, requiring them to navigate gendered expectations, perform additional emotional labor, and endure intensified scrutiny—burdens not imposed on male counterparts.

These harms are continuing, structural, and irreparable, and equitable relief is necessary to halt and remedy the practice. Plaintiff satisfies the criteria for injunctive relief under federal law, including a showing of irreparable harm, likelihood of success on the merits, absence of adequate legal remedies, a favorable balance of hardships, and alignment with the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

The ongoing exclusion of women from coaching men's teams causes enduring damage to female coaches by perpetuating exclusion, limiting advancement, and reinforcing harmful stereotypes. Defendant's practices have already been shown to create and perpetuate unlawful gender segregation and differential treatment, and monetary damages alone cannot address these systemic harms.

Accordingly, Plaintiff respectfully requests that the Court enter a mandatory injunction requiring Ferrum College to adopt and implement a comprehensive, evidence-based plan to

dismantle its gender-segregated coaching structure and replace it with equitable, inclusive practices. That plan should include:

a. a comprehensive assessment and accountability system to audit hiring patterns, track metrics, and establish enforcement mechanisms;

b. formalized entry programs for women seeking coaching roles on men's teams, including fellowships and diversity goals for graduate assistant positions;

c. career development infrastructure such as mentorships, leadership development, and cross-program learning;

d. hiring practice reform including structured interviews, bias-mitigation tools, and mandates for interviewing qualified women;

e. compensation and retention audits and reforms;

f. culture change initiatives to increase visibility and normalize women's leadership in athletics;

g. "protection paradox" mitigation protocols requiring rubrics and comparative analysis; and

h. reformed investigative methodologies that require specificity, corroboration, and cognitive bias screening.

The Court has authority under Title VII to grant such affirmative relief. The relief sought is narrowly tailored, evidence-based, and feasible within the context of Ferrum's resources and mission. Without judicial intervention, gender segregation in coaching will persist, perpetuating harm and systemic inequity. Granting this relief would redress Plaintiff's injuries and position Ferrum College as a national leader in collegiate equity. Plaintiff further requests that this Court

retain jurisdiction to oversee implementation and make any modifications necessary to ensure compliance and eliminate gender segregation.

DATED: July 29, 2025

Respectfully submitted,

_/s/ *Joshua Erlich*______________
Joshua Erlich, VA Bar No. 81298
THE ERLICH LAW OFFICE, PLLC
1550 Wilson Blvd., Ste. 700
Arlington, VA 22209
Tel: (703) 791-9087
Fax: (703) 722-8114
Email: jerlich@erlichlawoffice.com

Newkirk Zwagerman, P.L.C.

*/s/ Thomas Newkirk*
Thomas Newkirk
IA Bar No. AT0005791
tnewkirk@newkirklaw.com
Myles D. Young
IA Bar No. AT
myoung@newkirklaw.com
3900 Ingersoll Ave, Suite 201
Des Moines, IA 50312
Tel: (515) 883-2000
Fax: (515) 883-2000

*Pro Hac Vice Forthcoming*

*Attorneys for Plaintiff*