CLERKS OFFICE US DISTRICT COURT
AT ROANOKE, VA
FILED
September 30, 2026
LAURA A. AUSTIN, CLERK
BY: /s/ Hannah Warren
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| **CHARDONNAY HOPE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 7:25cv00510** |
| **v.** | ) | |
| | ) | |
| **FERRUM COLLEGE,** | ) | **By: Hon. Robert S. Ballou** |
| | ) | **United States District Judge** |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

Plaintiff Chardonnay Hope brings this case against her former employer, Ferrum College, alleging violations of Title VII of the Civil Rights Act of 1964 and the Virginia Human Rights Act ("VHRA"). Dkt. 1, 10. Ferrum moves to dismiss the Amended Complaint under Rule 12(b)(6) for failure to state a claim, which Hope opposes. Dkt. 12, 14. Because Hope does not allege facts to support a plausible claim above the speculative level, Ferrum's Motion to Dismiss will be granted.

## I. Factual Background[1]

Ferrum hired Hope in April 2022 as Head Coach for the women's field hockey team. Dkt. 10, ¶ 25. Hope was the first Black woman coach hired at Ferrum. *Id.* ¶ 26. Despite taking on a struggling field hockey program with only 11 players and no prior clinic history, Hope recruited an additional 12 student athletes in her first recruiting class and organized the first-ever field hockey clinic at Ferrum. *Id.* ¶¶ 26-27, 48. In fall 2022, Ferrum investigated Hope regarding text messages she sent to the team referencing other Ferrum staff members. *Id.* ¶ 30. The Amended Complaint does not indicate what Hope said in the text messages, or whether she faced

[1] The Court accepts as true the facts alleged in the Amended Complaint when reviewing a motion to dismiss. *See Aziz v. Alcolac, Inc.*, 658 F.3d 388, 390 (4th Cir. 2011).

any discipline because of the messages. Despite Ferrum's investigation into Hope, the school extended her employment contract for the 2023/24 school year, with a salary of $46,000. *Id.* ¶¶ 29-31. Hope alleges she "continued in her role without incident for nearly a year" including complying with her coaching responsibilities, expanding the program's recruiting outreach, and growing the athletic department. *Id.* ¶ 32.

In September 2023, two members of the women's field hockey team lodged "vague" complaints against Hope, including general allegations of "unprofessionalism" and "hostile" behavior, and Ferrum placed Hope on paid administrative leave, issuing a notice of allegations indicating "degrading," "excessive cursing," and "inappropriate comments." *Id.* ¶¶ 33-34. Hope states that both the complaints and the notice were overly general and failed to identify any specific conduct by her that violated Ferrum policy. *Id.* Ferrum conducted an internal investigation, interviewing 16 members of the women's field hockey team, Hope, and Hope's assistant coaches, between September 19-29, 2023. *Id.* ¶ 36. At the conclusion of the investigation, Ferrum terminated Hope's employment with the school. Hope takes issue with the methods Ferrum used in its internal investigation, specifically, Ferrum's failure to:

(1) Pose questions probing the basis of the allegation or exploring potential gendered misperceptions of Hope's coaching style;

(2) Pose questions to the field hockey team as to "when, where, or in what context" Hope allegedly used the terms "pathetic" or "loser," or what language they considered "degrading" or "excessive;" and

(3) Collect statements documenting Hope's use of abusive or demeaning language, or produce records showing inappropriate conduct, such as texts, e-mails or notes.

*Id.* ¶¶ 36-38. Hope, who describes her coaching style as "direct," maintains that her coaching methods "aligned with standard practices in collegiate athletics" and "were consistent with Ferrum's expectations" and thus her "termination cannot be understood apart from the broader

pattern of sex-based segregation and stereotyping that pervades collegiate coaching." *Id.* ¶¶ 40-41, 50. Ferrum terminated Hope's employment on October 9, 2023. *Id.* ¶ 52.

Hope alleges that male coaches at Ferrum were treated more favorably and presents "every male coach at Ferrum" as a valid comparator.[2] *Id.* ¶ 66, 67. The Amended Complaint specifically names eight male coaches[3] who used coaching methods such as "directness, intensity, and strict discipline" without adverse consequences, while her own similar coaching methods were mischaracterized as unprofessional or emotionally harmful. *Id.* ¶¶ 45-47, 67. Generally, Hope alleges that the male coaches at Ferrum are permitted to "use a full range of coaching methods" including methods "traditionally characterized as 'masculine'" without being labeled as toxic, abusive, or unprofessional, and instead being framed as "strong leadership" or high standards. *Id.* ¶ 67. Specifically, she describes the various coaching styles as "firm, performance driven" (Ryan Brittle, Baseball Coach), "intense sideline demeanor" and direct communication style (Patrick Corrigan, Basketball Coach), "high pressure tactics and vocal criticism" (Cleive Adams, Football Coach), "rigorous training and direct feedback" and "raised voice and demanding standards" (Mark White, Cross Country and Track & Field Coach), "assertive coaching style" (Rod Baker, Tennis Coach), and "direct, performance-based coaching

[2] In her response to the Motion to Dismiss, Hope concedes that she has not alleged that athletes lodged similar complaints against these male coaches, but states that it is the absence of complaints that is the discrimination. Dkt. 14 at 5. She states she does not need traditional comparators for her sexual stereotyping claim. Dkt. 14 at 5.

[3] Hope does not state the race of these other coaches, and thus it is not clear how they could be used as comparators to support a racial discrimination claim. *See e.g. Booth v. Cnty. Exec.*, 186 F. Supp. 3d 479, 486 (D. Md. 2016) (Black employee failed to allege sufficient facts to create plausible inference that he was treated differently from similarly situated coworkers based on his race, when employee failed to provide the race of coworkers who were allegedly treated more favorably).

methods" (Josh Freeman, Softball Coach and Zach Louie, Lacrosse Coach). *Id.* Hope alleges that, while some of these male coaches, specifically Rod Baker and Bryan Harvey[4], have at times drawn complaints, Ferrum College has supported the coaches. *Id.* ¶¶ 67, 69, 70. Hope does not describe the nature of these complaints, but states that Coaches Baker and Harvey, despite "athlete concerns" continue to receive institutional support. *Id.* Hope also presents the recent no confidence vote by the faculty in the female President of Ferrum, Dr. Martin, citing a toxic work environment and lack of transparency and criticizing the President's leadership style and demeanor, as evidence of Ferrum's "broader culture of stereotyping female leaders." *Id.* ¶ 77-84. However, the Board of Trustees rejected the faculty's vote, and issued a formal vote of confidence in the president, citing her achievements as president. *Id.* ¶ 78.

Hope brings claims under Title VII for sex discrimination, race discrimination, and hostile work environment (Claim 1), illegal segregation and limitation on hiring and retention of women (Claim 2), negligent discrimination (Claim 3), and disparate impact discrimination (Claim 4), and also alleges these claims under the VHRA [5] (Claims 5-8).

## II. Standard of Review

---

[4] While Hope lists Harvey (Basketball and Golf Coach), she does not specify his coaching style. Dkt. 10 ¶ 67(f).

[5] Ferrum initially argued that Hope failed to exhaust her administrative remedies under the VHRA, but Ferrum conceded at the hearing that the 2024 Amendments to the VHRA permit plaintiffs to proceed under the VHRA based on the EEOC right-to-sue letter:

> For any complaint or charge of discrimination for which the complainant has received a Notice of Right to Sue from the E.E.O.C., the general district or circuit court having jurisdiction shall accept the E.E.O.C. Notice of Right to Sue as a notice of the right to file a civil action under subsection H.

Va. Code § 2.2-3907(I).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "In *Iqbal*, the [Supreme] Court made clear that this heightened standard applied to all civil actions, including claims of discrimination." *Woods v. City of Greensboro*, 855 F.3d 639, 647 (4th Cir. 2017). Still, a plaintiff is not required to plead a prima facie case of discrimination under Title VII to survive a motion to dismiss. *McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 584-85 (4th Cir. 2015); *Barbour v. Garland*, 105 F.4th 579, 590 (4th Cir. 2024) (noting that "a Title VII retaliation claim may survive a motion to dismiss under [Rule] 12(b)(6) even if the complaint does not allege facts sufficient to establish the *McDonnell Douglas* framework's prima facie case"). Instead, to survive a motion to dismiss a plaintiff must allege sufficient facts "to satisfy the elements of a cause of action created by [the applicable] statute." *McCleary-Evans,* 780 F.3d at 585. A plaintiff purporting to state a claim under Title VII must allege facts to satisfy the elements of a cause of action created by that statute – specifically, that defendant terminated her employment "because of [her] race ... [or] sex." *Id. citing* 42 U.S.C. § 2000e-2(a)(1).

## III. Law & Analysis

Under Title VII, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII prohibits both "disparate treatment discrimination," as well as "disparate-impact discrimination." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)). In a disparate treatment claim, the "employer simply treats some people less favorably than others because of their race, color,

religion, sex, or national origin" and "proof of discriminatory motive is critical." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 (1977). In contrast, disparate impact claims involve facially neutral employment practices that have a discriminatory impact which cannot be justified by business necessity. *Id.* "Proof of discriminatory motive . . . is not required under a disparate-impact theory. *Id.*

The VHRA likewise makes it unlawful for an employer to discriminate on these grounds[6] and the VHRA claims can be analyzed under the same framework as the Title VII claims. *See Brackney-Wheelock v. City of Charlottesville*, 652 F. Supp. 3d 603, 633 (W.D. Va. 2023) (indicating that the claims are identical and holding that "since [plaintiff's] Title VII discrimination claims will be dismissed, so too will her VHRA claim").

**A. Disparate Treatment**

Hope must plausibly allege that she was terminated "because of" her race or sex to survive a motion to dismiss.[7] 42 U.S.C. § 2000e-2(a)(1). Otherwise, her allegations are simply

[6] The VHRA provides it is unlawful for an employer to discriminate against any individual "because of such individual's race, race, color, religion, sex, sexual orientation, gender identity, marital status, pregnancy, childbirth or related medical conditions including lactation, age, military status, disability, or national origin. Va. Code § 2.2-3905(B)(1)(a).

[7] As acknowledged above, an employment discrimination plaintiff need not plead a prima facie case of discrimination to withstand a motion to dismiss. Still, a plaintiff can establish a prima facie Title VII discrimination claim through one of two methods of proof: (1) demonstrating through direct evidence that her sex or race was a motivating factor in the employer's adverse employment action; or (2) relying on the burden shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019). Plaintiffs using the burden-shifting scheme must allege: (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) similarly situated employees outside the protected class who received more favorable treatment. *Tabb v. Bd. of Ed. of Durham Pub. Schs.*, 29 F.4th 148, 157 (4th Cir. 2022)). If an employee meets his burden to establish a prima facie case, the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for the adverse employment action. *Haynes*, 922 F.3d at 223. If the employer meets this burden of production, the employee must then demonstrate that the defendant's proffered reason is pretextual. *Id.*

conclusory, and do not "raise a right to relief above the speculative level." *Coleman v. Md. Ct of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (citations omitted).

**(1) Sex Discrimination**

Hope claims Ferrum terminated her because she failed to conform to gender stereotypes and was labeled too intense, inappropriate, or unprofessional. Hope emphasizes that she is not claiming that she engaged in conduct identical to male coaches who also received complaints; instead, she is claiming that her identical coaching conduct was perceived differently based on her gender, and it is the "absence of complaints against male coaches using the same methods" that "is the discrimination" here. Dkt. 14 at 5. Hope also argues that the following evidence raises an inference of unlawful gender discrimination:

> While male coaches are presumed competent and supported through complaints, Coach Hope was presumed guilty, suspended, and terminated without the same opportunity to respond or receive institutional backing.

Dkt. 10 ¶ 70. In support, Hope alleges that she was held to "gendered expectations about how a female coach should communicate" including with "warmth, deference, and emotional attunement" while male coaches were not held to these standards. Dkt. 10 ¶¶ 45, 93, 140.

Ferrum argues that the Amended Complaint itself shows that Hope was terminated for nondiscriminatory reasons, noting that "she was investigated and eventually terminated after Ferrum received complaints of her 'unprofessionalism' and 'hostile' behavior from two of her student athletes." Dkt. 16 at 5. Ferrum also argues that Hope's claims fail because she fails to allege a similarly situated male comparator coach, who received similar athlete complaints but was not terminated. Dkt. 13 at 10. Hope, pointing to the Supreme Court's reasoning in *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989), emphasizes that it is the "absence of the

complaints [by athletes] against male coaches employing the same methods [that] *is* the discrimination." Dkt. 14 at 1.

Under the pleading standards of *Iqbal* and *Twombly*, on a motion to dismiss this court "must consider the plausibility of inferring discrimination . . . in light of an 'obvious alternative explanation for the conduct." *Iqbal*, 556 U.S. at 682. In *Iqbal* the Supreme Court analyzed "*Twombly's* construction of Rule 8" and concluded the complaint had not pushed the claims "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680. First, the court identified allegations in the complaint that were not entitled to an assumption of truth because they were conclusory. *Id.* at 681. "[T]he Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context." *Id.* at 686. Next, the court determined whether the factual allegations in the complaint "plausibly suggest an entitlement to relief" by considering whether there was an "obvious alternative explanation." *Id.* Because the court found an "obvious alternative explanation" it held that the allegations of discrimination in the complaint were not plausible. The Fourth Circuit applied the same method in *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 609 (4th Cir. 2020), determining on a motion to dismiss that, based on the allegations in the Complaint, the employer terminated Bing on his first day of work because "a Google search on Bing . . . reported [his] tangential involvement in a shooting for which he faced no charges" and not because of discriminatory animus. *Id.* (noting that "[b]eing aware of no alternative explanation and guessing that conduct is racially motivated does not amount to pleading actual facts to support a claim of racial discrimination).

Applied here, Hope's conclusory allegations do not push her claims across the line from conceivable to plausible. Hope claims Ferrum terminated her because she failed to conform to gender stereotypes. She maintains that her coaching methods "aligned with standard practices in

collegiate athletics" and "were consistent with Ferrum's expectations" and thus her "termination cannot be understood apart from the broader pattern of sex-based segregation and stereotyping that pervades collegiate coaching." Dkt. 10, ¶¶ 40-41, 50. However, her conclusory factual allegations, especially when combined with Ferrum's obvious alternative explanation, render Hope's sexual discrimination claim implausible. *See e.g. Woods v. City of Greensboro*, 855 F.3d at 648 (although the plaintiff need not establish a prima facie case at the motion to dismiss stage, the court must still be satisfied that the defendant's explanation for the allegedly discriminatory act does not "render [the plaintiff]'s allegations "implausible"). In short, Hope's conclusory allegations cannot withstand the obvious alternative explanation that Ferrum terminated her, not because she was a woman, but because athletes on her own field hockey team complained of her coaching behavior, which Ferrum investigated and deemed merited termination.

Hope alleges in her Amended Complaint that Ferrum's statement that it terminated her employment based on claims from athletes on her team that she engaged in "inappropriate comments," "excessive cursing", and "degrading language," was a pretext for sex discrimination. Dkt. 10, ¶ 47 (describing these claims as the "feedback used to justify Ferrum's adverse action against Coach Hope.").[8] Likewise, Hope alleges these student complaints "mirror the type of conclusory allegations that have been empirically linked to gender bias in the evaluation of female coaches" and that Ferrum "did not apply its standards equally to male coaches." *Id.* ¶ 5,

---

[8] As alleged in the Amended Complaint, after Hope's field hockey team lodged complaints that she was "unprofessional" and "hostile," Ferrum placed her on paid administrative leave, notified her of allegations that she had engaged in "degrading," "excessive cursing," and "inappropriate comments," and conducted an internal investigation, interviewing members of the team, assistant coaches, and Hope herself. Dkt. 10, ¶¶ 33-36. The investigation produced allegations that Hope had used the terms "pathetic" and "loser," though it is unclear "where, when, or in what context." *Id.* ¶¶ 36-38. Ferrum terminated Hope following the internal investigation.

47. However, student complaints of Hope acting "unprofessional" and "hostile" don't support a plausible inference that Ferrum discharged Hope because of her sex. Hope's allegation that these types of "conclusory allegations" have been linked in studies to gender bias in evaluation of female coaches does not change this. Indeed, the allegations here resulted in a multi-day investigation and were supported by allegations of "degrading," "excessive cursing," and "inappropriate comments." Dkt. 10, ¶¶ 33-36. Hope alleges both that the field hockey team complained about her coaching and that Ferrum accepted those complaints and terminated Hope, because of Hope's sex, but those allegations are just conclusory and speculative. "The mere fact that a certain action is potentially consistent with discrimination does not alone support a reasonable inference that the action was motivated by bias." *Bing*, 959 F.3d at 618. In light of Hope's allegations that she was expanding field hockey recruiting and growing the athletic department, Ferrum's termination decision might have been unwise, unfair, or misguided, but the complaint does not state a plausible claim that it was motivated by Hope's sex.

Hope points to *Price Waterhouse v. Hopkins*, for the legal premise that "an employer violates Title VII when it makes an adverse employment decision based on gender stereotypes." However, *Price Waterhouse* does not help Hope to withstand a motion to dismiss here. In *Price Waterhouse*, a woman who was denied a partnership in her accounting firm had a discrimination claim against that firm when the firm had denied her the promotion because she failed to conform to gender stereotypes. 490 U.S. 228. The court explained, in the "specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender." *Id.* As the Supreme Court reasoned:

> An employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not. Title VII lifts women out of this bind.

*Id.* at 251. As the dissent in *Price Waterhouse* emphasizes, the holding permits finding an impermissible motive when the plaintiff presents direct evidence of such motive:

> [I]n a limited number of cases Title VII plaintiffs, by presenting direct and substantial evidence of discriminatory animus, may shift the burden of persuasion to the defendant to show that an adverse employment decision would have been supported by legitimate reasons. The shift in the burden of persuasion occurs only where a plaintiff proves by direct evidence that an unlawful motive was a substantial factor actually relied upon in making the decision.

*Id*. at 280 ("the Court alters the evidentiary framework of *McDonnell Douglas* and *Burdine* for a closely defined set of cases"). "Direct evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Davis v. Chevron, U.S.A., Inc.,* 14 F.3d 1082, 1085 (5th Cir.1994) (alterations in original, quotations and citations omitted). Hope provides no facts showing direct evidence of sexual stereotyping, instead supporting her claim that Ferrum terminated her because she was a woman with the conclusory allegation that her appropriate coaching methods were misconstrued. In *Price Waterhouse* the direct evidence of sexual stereotyping included firm partners describing the plaintiff as requiring a course at charm school and opining that her interpersonal skills could be corrected through more feminine clothing and makeup.

Essentially, like in *Price Waterhouse*, Hope claims that Ferrum "reacted negatively to her personality because she is a woman." *Price Waterhouse*, 490 U.S. at 257–58 (noting that the court's perception of the plaintiff's character was "irrelevant, [w]e sit not to determine whether [the plaintiff] is nice, but to decide whether the partners reacted negatively to her personality because she is a woman"). However, as discussed above, Hope's allegations are conclusory, as she does not allege sufficient facts to support a plausible inference of sex discrimination. Even though Hope need not establish a *prima facie* case to withstand a motion to dismiss, she still

must set out sufficient allegations to permit the court to "infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679.

Likewise, Ferrum's treatment of the male coaches discussed in Amended Complaint does not provide direct evidence of sexual stereotyping, including that Ferrum did not apply its coaching standards equally to male and female coaches. While Hope describes various coaching styles of the male coaches and alleges that "male coaches employing comparable coaching styles are neither scrutinized nor penalized" she does not adequately allege these male coaches engaged in the same type of coaching behavior for which she was terminated. Specifically, Hope alleges Ferrum terminated her for coaching behavior that it viewed as unprofessional, hostile, or using degrading language or excessive cursing. Hope does not allege that the male coaches used similar language or levels of cursing but were not penalized. Instead, Hope alleges these male coaches used directness, intensity and strict discipline – and that when she used comparable coaching methods, her methods were mischaracterized as unprofessional or emotionally harmful. *Id.* ¶¶ 45-47, 67. This is not direct evidence of stereotyping because Hope's specific factual allegations do not allege the same coaching conduct.

Finally, Hope points to Ferrum's treatment of its President, Dr. Martin, as providing evidence of discrimination. However, Dr. Martin's situation does not provide such evidence, both because Dr. Martin, as President of Ferrum, performed a very different role from Hope and because Dr. Martin, though allegedly criticized by faculty, was not terminated.

**(2) Race Discrimination**

Ferrum argues that the Amended Complaint does not contain sufficient factual allegations to plausibly assert a claim for race discrimination, and, except for conclusory racial allegations, lacks any factual detail about how race factored into the adverse employment

decision here. Hope counters that her claims for race discrimination "rests on intersectionality" and that alleging that she was the first Black woman coach in Ferrum history and was labeled as "abrasive, unprofessional, or too aggressive" which is "coded language frequently weaponized against women in authority," and particularly against Black women is sufficient to withstand a motion to dismiss.

Intersectionality theory suggests that people have multiple identities that "legal doctrines based solely on a single identity or status" fail to address. *Westmoreland v. Prince George's Cnty.*, 876 F. Supp. 2d 594, 604 (D. Md. 2012) (quoting Dianne Avery, *et al., Employment Discrimination Law* 47 (8th ed. 2010)). These cases involve discrimination that occurs not only "because of the plaintiff's sex, but because of both sex and some other characteristic." *Id.* (quoting Avery, *et al., supra*, at 352). The Fourth Circuit has not dealt with intersectionality yet, though other circuits have recognized intersectional claims under Title VII. *See Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 337 (4th Cir. 2010) (noting that because the issue was not raised by the plaintiff, the court "decline[s] to address whether she would have been able to sustain a "hybrid" sex *and* race claim under Title VII"). This court has previously recognized an intersectional sex-plus-age claim as cognizable under Title VII, though ultimately holding the plaintiff failed to allege sufficient facts to support the claim. *Metzger v. Rector & Visitors of Univ. of Virginia*, No. 3:23-CV-58, 2024 WL 4357236, at *7 (W.D. Va. Sept. 30, 2024).

Likewise, here, even assuming the Fourth Circuit would recognize an intersectional claim, Hope has not stated one. Hope has failed to allege sufficient facts to state a claim based on either race, or the intersection of race-plus-gender. Hope does not provide sufficient factual support that the language Ferrum used to describe her conduct was "coded language" – instead

relying on generalities about how these terms may be used against Black women in positions of authority. Of course, courts have recognized that facially non-discriminatory words can be used as racially charged code words, and determining whether the usage is benign or evidence of discriminatory intent depends on factors such as "context, inflection, tone of voice, local custom, and historical usage." *Ash v. Tyson Foods, Inc.,* 546 U.S. 454, 456 (2006) (per curiam) (holding that use of "boy," without any racial modification "like 'black' or 'white,'" may be evidence of discrimination). However, without factual support in the complaint, including how the context in which the words were used show discriminatory intent, I cannot find that the alleged terms were "coded language" sufficient to support a claim for race discrimination, or intersectional race and sex discrimination. *See e.g. Montgomery v. New York City Transit Auth.*, 806 F. App'x 27, 31 (2d Cir. 2020) (finding that the record did not support plaintiff's claim that being "loud" was "coded language for both gender and racial stereotypes"); *Thelwell v. City of New York,* 2015 WL 4545881, at * 10 (S.D.N.Y. 2015) (the few instances defendants' used the words "angry" and "abrasive" did not rise to the level of racial code words); *Nolley v Swiss Reinsurance Am. Corp.,* 857 F.Supp 2d 441 (S.D.N.Y. 2012) (noting that "the word 'aggressive' is an adjective that is frequently used in ordinary conversation with no racial overtones or implied reference[, and t]hus, its ability to denote bias depends entirely on its context").

**(3) Hostile Work Environment**

"Since an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." *EEOC v. R & R Ventures*, 244 F.3d 334, 338 (4th Cir. 2001). A hostile environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Boyer-*

*Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (internal quotation marks omitted).

"To survive dismissal of her claim of a hostile work environment based on her protected characteristics, [Hope] must offer facts that plausibly support inferences[9] that 'she was subjected to (1) unwelcome conduct, (2) based on her race . . . or sex, that was (3) severe or pervasive enough to make her work environment hostile or abusive and (4) imputable to her employer." *Laurent-Workman v. Wormuth*, 54 F.4th 201, 210 (4th Cir. 2022) (citation omitted). Hope must also allege that her protected characteristic was the "but for" cause of the alleged harassment. *Id.* There are "both subjective and objective components" to the third element. *Ocheltree,* 335 F.3d at 333 (*citing Harris,* 510 U.S. at 21–22). The victim must perceive the environment as hostile or abusive, and that perception must be objectively reasonable. *Harris,* 510 U.S. at 22. Likewise, when analyzing the third element, courts consider all the circumstances at play, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. Title VII is not a "general civility code" and "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotations and citations omitted); *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (noting workplaces are "not always harmonious

---

[9] As discussed, "At [the motion to dismiss] stage, 'an employment discrimination plaintiff need not plead a prima facie case of discrimination.'" *Laurent-Workman v. Wormuth*, 54 F.4th 201, 210 (4th Cir. 2022) *quoting Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (defining what a plaintiff must show to survive a motion to dismiss a hostile work environment claim).

locales [where] even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard").

Hope does not identify conduct that plausibly supports inferences that state a claim for a hostile work environment. While Hope argues that the Amended Complaint alleges "more than isolated incidents" describing a "pattern of discriminatory treatment," Hope does not even allege isolated incidents showing a hostile workplace. Dkt. 14 at 7. Her allegations of a hostile work environment are entirely conclusory and primarily focus on the methods Ferrum used to investigate her conduct, a time period during which Hope alleges she was on administrative leave. Hope alleges that she was subject to different evaluative standards from those applied to male coaches, and that Ferrum's investigation was procedurally deficient and lacked corroboration. The Complaint certainly does not allege specific facts demonstrating the kind of severe and pervasive discriminatory "intimidation, ridicule, and insult" that characterizes a hostile work environment. *Boyer-Liberto*, 786 F.3d at 277 (en banc).[10] Accordingly, Hope has not plead a plausible claim for a hostile work environment "above the speculative level." *Coleman*, 626 F.3d at 190.

**B. Illegal Segregation**

Under 42 U.S.C. 2000e-2(a)(2), an "infrequently litigated provision in Title VII" it is

[10] While Hope points to *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 335 (4th Cir. 2010) for the rule that "in the Fourth Circuit, the question of whether 'harassment was sufficiently severe or pervasive is quintessentially a question of fact," here Hope does not allege facts showing harassment in the first place. In contrast, in *Mosby-Grant*, the plaintiff confronted a work environment with pervasive sexist comments, including brazen descriptions of sexual encounters, demeaning and vulgar language towards women, and selective taunting, causing her to often leave work in tears.

unlawful for an employer "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." *United States Equal Emp. Opportunity Comm'n v. AutoZone, Inc.*, 860 F.3d 564, 565–66 (7th Cir. 2017). Hope alleges that Ferrum violated this provision by excluding women from coaching men's teams, thereby reinforcing stereotypes which affected all female coaches, including Hope. However, Ferrum counters that Hope does not allege any policy at the college that shows segregation and that Hope never applied to coach a men's team.

The Amended Complaint does not a state a claim for illegal segregation because Hope has not alleged any policy at Ferrum tending to show segregation. The allegation that no women serve as head coaches or assistant couches for any of the men's sports teams is not sufficient here, especially because Hope has not alleged that she applied to and was excluded from employment at Ferrum. In fact, Hope has alleged that she was hired for the job she applied to, Head Field Hockey Coach.

I recognize that statistics and social science evidence can play a significant role in proving illegal workplace discrimination. *See Carter v. Ball*, 33 F.3d 450, 456 (4th Cir. 1994) ("Statistics can provide important proof of employment discrimination."); *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 265 (4th Cir. 2005) ("In establishing a prima facie violation of Title VII, a plaintiff may use statistical evidence."). However, the absence of female head or assistant coaches for male teams at Ferrum does not plausibly support an inference of discrimination, as required at the motion to dismiss stage, without some evidence of the pool of qualified women coaching applicants for these positions. *Id.* (explaining that the

"mere absence of minority employees in upper-level positions does not suffice to prove a *prima facie* case of discrimination without a comparison to the relevant labor pool"). Hope argues that "detailed statistical proof" is not required at this stage, and that the discovery process "will reveal the precise numbers." Dkt. 14 at 13. While no heightened pleading is required for employment discrimination claims, plaintiff's must still allege sufficient facts to "raise a right to relief above the speculative level", which requires alleging a relevant labor pool. Here, Hope does not allege that she was qualified to coach a men's team, nor does she allege an estimate of the pool of qualified women coaching applicants for these positions.

In *Armstrong v. Index J. Co.*, a Fourth Circuit illegal segregation case, the court found that a newspaper discriminated against a female salesman in violation of Title VII when a female employee was assigned a separate classification of "special salesman," while only men held the classification "regular salesmen." 647 F.2d 441, 444–45 (4th Cir. 1981). The court wrote:

> [T]he record established a prima facie case of disparate treatment. [The plaintiff] demonstrated that she was a member of a protected class, that she was employed in a job expressly limited to the protected class and that she was excluded from a higher paid classification whose duties she satisfactorily performed. The Journal's segregation of jobs by sex adversely affected her status as an employee and deprived her of the opportunity to reach the maximum salary payable to salesmen.

*Id*. In contrast, Hope has not alleged that she was excluded from a job coaching men's sports at Ferrum, because she never applied for such a position. Hope argues that the "futile gesture" doctrine excuses this failure. Under the "futile gesture" doctrine, assuming she meets the other three prongs of the *McDonnell Douglas* test, a plaintiff who has failed to apply for a job may still prove a prima facie case of discrimination by demonstrating that he "would have applied but for accurate knowledge of an employer's discrimination and that he would have been discriminatorily rejected had he actually applied." *Brown v. McLean*, 159 F.3d 898, 902–03 (4th Cir. 1998) quoting *Pinchback v. Armistead Homes Corp.,* 907 F.2d 1447, 1451 (4th Cir.1990).

Here however, Hope has not alleged any job she would have applied for and that she was qualified for that job; as such, her claim is hypothetical, at best, and does not withstand a motion to dismiss.

**C. Negligent Discrimination**

Hope describes this claim as "a failure to exercise reasonable care to prevent discrimination that the employer knew or should have known would occur" and notes that "Title VII has long incorporated negligence principles." Dkt. 14 at 11. Hope argues that her allegations that Ferrum knew of the risks associated with gender bias in college athletics and failed to adopt investigative safeguards to reduce that impact, state a claim that Ferrum "failed its duty of care under Title VII." Dkt. 14 at 12. However, none of the cases cited by Hope provide support for her claim that Ferrum is liable under Title VII for negligent disparate treatment. "A disparate-treatment plaintiff must establish that the defendant had a discriminatory intent or motive for taking a job-related action." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (citations omitted). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).

Contrary to Hope's arguments, *Faragher v. City of Boca Raton* subjects an employer to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor. 524 U.S. at 807. This vicarious liability attaches to the supervisor's intentional actions in creating an abusive working environment, not negligence principles. Specifically, in *Faragher,* the plaintiff's supervisors "created a 'sexually hostile atmosphere' at the beach by repeatedly subjecting Faragher and other female lifeguards to 'uninvited and offensive touching,' by making lewd remarks, and by speaking of women in offensive terms." 524 U.S. at 780. While

the *Faragher* court does contemplate that the employer may raise an affirmative *defense* that includes negligence principles[11], this does not mean that the hostile work environment can be created negligently.

**D. Disparate Impact**

Hope can establish her disparate impact discrimination claim under Title VII by showing that a "facially neutral employment practice had a significantly discriminatory impact." A*nderson*, 406 F.3d at 265; *Griggs,* 401 U.S. at 430 ("Under [Title VII], practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices."). After a plaintiff establishes a prima facie case, to avoid a finding of discrimination, the employer must show that "any given requirement [has] a manifest relationship to the employment in question." *Griggs,* 401 U.S. at 433. "Even in such a case, however, the plaintiff may prevail, if he shows that the employer was using the practice as a mere pretext for discrimination." *Connecticut v. Teal,* 457 U.S. 440, 447 (1982).

Hope points to three policies as producing a disparate impact on women: (1) "Complaint-Driven Evaluation Policy" where "Ferrum College evaluates coaches and initiates disciplinary proceedings largely based on the number and nature of athlete complaints, without corroboration or neutral validation." Dkt. 10 ¶ 127(i); (2) "Flawed Investigative Procedures" that fail to require specific factual allegations, ensure corroboration, and "does not account for the operation of gender stereotypes." Dkt. 10 ¶ 127(ii) and (3) "Reactive Intervention Without Contextual

[11] The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. 524 U.S. at 807.

Training" meaning making adverse employment decisions in response to student complaints without educating students, investigators or decisionmakers on gender-based reporting differences, stereotype activation, or the "protection paradox."

Hope alleges that "because female athletes report concerns at higher rates than male athletes–a well-documented effect of gender socialization–this policy subjects female coaches to disproportionate scrutiny." Dkt. 10 ¶ 127(i). Hope offers statistical data in her Amended Complaint to show the disparate impact of these policies, specifically (1) that no women serve as head coaches for men's teams at Ferrum; and (2) "the disproportionate rate at which female coaches of women's teams face adverse employment actions relative to male coaches." *Id.* ¶ 128. However, Hope does not specify the "disproportionate" rate. Further, while Hope broadly alleges that female coaches of women's teams at Ferrum were statistically subject to more adverse employment actions relative to male coaches, she does not provide any factual support for this statement, such as any other female coaches of women's teams who were subject to adverse employment actions. It is unclear where the statistics Hope alleges come from – are they from Ferrum itself, or national or even international statistics? Again, while Hope may be correct that "detailed statistical proof is not required at the pleading stage," she must allege statistics relevant to the defendant. Hope's offered statistical data simply does not raise a plausible inference that Ferrum's employment practice has a discriminatory impact on female coaches.

## IV. Conclusion

Accordingly, defendant's motion to dismiss the Amended Complaint is granted. Hope had previously amended the Complaint as a matter of right after defendants filed a motion to dismiss. Dkt. 1, 7, 10. The Amended Complaint alleges in a fulsome fashion the facts that Hope claims support her causes of action and it does not appear that there are any additional facts that

Hope could allege that could correct the deficiencies in her Amended Complaint as identified in this opinion. Accordingly, the Amended Complaint is dismissed without leave to amend. An appropriate Order accompanies this opinion.

Entered: September 30, 2026

*Robert S. Ballou*

Robert S. Ballou
United States District Judge